Marvin THOMAS and Jacqueline Smith, h/w and Margaret Baldino and Diane DePew, Individually and as Administratrix of the Estate of Jennifer DePew, her daughter, deceased and Ruby Goode–Henry, Individually and as Administratrix of the Estate of Racquel R. Burnett, her daughter, deceased

v.

The CITY OF PHILADELPHIA and Officer Jay Bigle and Linda Lockwood, as administratrix of the Estate of Joseph Ross.

Appeal of Ruby Goode–Henry, Individually and as Administratrix of the Estate of Racquel R. Burnett, her daughter, Deceased.

Marvin Thomas and Jacqueline Smith, h/w, and Margaret Baldino and Diane P. DePew, Individually and as Administratrix of the Estate of Jennifer Lynn DePew, her daughter, deceased and Ruby Goode–Henry, Individually and as Administratrix of the Estate of Racquel R. Burnett, her daughter, deceased

v.

City of Philadelphia, Police Officer Jay Bigle, Sgt. Jodi Schwarzl and Linda Lockwood, Administratrix of the Estate of Joseph Ross, deceased.

Appeal of Linda Lockwood.

Marvin Thomas and Jacqueline Smith, h/w, and Margaret Baldino and Diane P. DePew, Individually and as Administratrix of the Estate of Jennifer Lynn DePew, her daughter, deceased and Ruby Goode–Henry, Individually and as Administratrix of the Estate of Racquel R. Burnett, her daughter, deceased

v.

City of Philadelphia, Police Officer Jay

Bigle, Sgt. Jodi Schwarzl and Linda Lockwood, Administratrix of the Estate of Joseph Ross, deceased.

Appeal of Jodi Schwarzl.

Commonwealth Court of Pennsylvania.

Argued March 11, 2002.
Decided June 28, 2002.

Ruben Honik, Philadelphia, for appellant.

Jane L. Istvan, Philadelphia, foe appellees, J. Bingle, J. Schwarzl and the City of Philadelphia.

John M. DeFeo, Philadelphia, for appellee, L. Lockwood.

BEFORE: McGINLEY, Judge, LEAVITT, Judge, and MIRARCHI, Jr., Senior Judge.

Opinion by Judge LEAVITT.

This is an appeal[1] from an Order of the Court of Common Pleas of Philadelphia (trial court) in a negligence and civil rights case. The Order entered judgment *n.o.v.* in favor of defendant Sergeant Jodi Schwarzl (Sergeant Schwarzl) and against the plaintiff, Ruby Goode–Henry, Administratrix of the Estate of Racquel R. Burnett; entered a judgment of non-suit in favor of defendant City of Philadelphia (City); and entered judgment on the jury verdict absolving Officer Bigle from liability but holding Linda Lockwood, Administratrix of the Estate of Joseph Ross, liable in the amount of $744,000. We affirm.

This appeal arose from a multiple car crash that occurred on January 12, 1998 on Interstate 95 (I–95) in Philadelphia, in which three people were killed[2] and two others seriously injured. The accident occurred when Joseph Ross (Ross), a 17–year old suspect in a briefcase theft, proceeded in the wrong direction on I–95, while attempting to elude the police. Ross's pick-up truck collided head on with a vehicle operated by Marvin Thomas (Thomas), who was injured; Thomas's passenger, Racquel Burnett (Burnett), was killed. Ross's truck then struck a car operated by Margaret Baldino, who was seriously injured. Ross and Jennifer De-Pew (DePew), a passenger in Ross's truck, were both killed.

1. Three cases arising from the same incident were consolidated for appeal: the Appeal of Ruby Goode–Henry, administratrix of the estate of Racquel R. Burnett, her daughter, who was a passenger in the car driven by Marvin Thomas (1094 C.D. 2001); the Appeal of Linda Lockwood, administratrix of the estate of Joseph Ross, her son, who was the driver of the truck that was the subject of the police pursuit (1095 C.D. 2001); and the Appeal of Jodi Schwarzl, the police sergeant who directed the investigation and pursuit of Joseph Ross on the day of the fatal crash (1096 C.D. 2001). Settlements were reached on the cases filed by the other named plaintiffs either prior to or during trial.

2. Throughout this opinion, we use the decedent's last name to refer to a party, recognizing that in the litigation the actual party was the administrator of the decedent's estate. Depending on the context, the decedent's last name refers to the person killed in this tragedy or it refers to the estate.

Officer Jay Bigle (Officer Bigle) of the Philadelphia Police Department discovered the theft of his briefcase from his police cruiser at approximately 4:45 p.m. on the day of the accident. The accident occurred at 9:32 p.m. that night. During the intervening time Officer Bigle investigated the theft, receiving direction and assistance from his supervisor, Sergeant Schwarzl; together they conducted a house-to-house investigation. They identified Ross as the suspect and then learned that he could be apprehended at an intersection in northeast Philadelphia where he was taking his passenger, DePew. At 9:25 p.m., Ross appeared at the appointed intersection; however, he did not discharge his passenger as expected. Instead, he drove away, ignoring the flashing lights and sirens of several police vehicles; the police began a low speed pursuit through the streets of northeast Philadelphia. At 9:29 p.m., Ross entered an I–95 entrance ramp and made a sudden stop, causing Officer Bigle to hit Ross's truck and turn it perpendicular to the ramp. The truck was

not seriously damaged, and Ross proceeded onto I–95 traveling north against southbound traffic. He was not followed. Sergeant Schwarzl immediately ordered the pursuit terminated and the flashing lights on the police cruisers cut in order to signal to Ross that the pursuit was over.

Thomas, Baldino, Burnett and DePew filed negligence actions against the City and against Ross. They also filed civil rights actions under 42 U.S.C. § 1983 [3] against the City, Officer Bigle and Sergeant Schwarzl.

The City tendered the statutory maximum [4] to settle all of Baldino's claims and the negligence claims of all other plaintiffs prior to trial. Although the insurer for Ross tendered the policy limits to all the plaintiffs it did so without a formal settlement and, therefore, Ross's liability in negligence was presented to the jury. The jury returned a verdict against Ross in the amount of $744,000.

The case proceeded on the remaining civil rights claims of Thomas, Burnett and

---

**3.** It states:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.
42 U.S.C. § 1983.

**4.** 42 Pa.C.S. § 8528 provides, *inter alia,*

(a) General rule.—Actions for which damages are limited by reference to this subchapter shall be limited as set forth in this section.
(b) Amount recoverable.—Damages arising from the same cause of action or transaction or occurrence or series of causes of action or transactions or occurrences shall not exceed $250,000 in favor of any plaintiff or $1,000,000 in the aggregate.
(c) Types of damages recoverable.—Damages shall be recoverable only for:
(1) Past and future loss of earnings and earning capacity.
(2) Pain and suffering.
(3) Medical and dental expenses including the reasonable value of reasonable and necessary medical and dental services, prosthetic devices and necessary ambulance, hospital, professional nursing, and physical therapy expenses accrued and anticipated in the diagnosis, care and recovery of the claimant.

DePew against the City and the two police officers. DePew and Thomas settled before trial, leaving only Burnett in the case. At the close of the presentation of Burnett's evidence, the trial court granted the City's motion for nonsuit. The jury absolved Officer Bigle of liability but found Sergeant Schwarzl liable under Section 1983 of the Civil Rights Act to Burnett in the amount of $744,000.

The trial judge granted Sergeant Schwarzl's post-trial motion for judgment *n.o.v.* because the evidence presented by Burnett was not sufficient to show the high degree of culpability required to find liability under Section 1983 for the conduct of a police pursuit. The trial court determined that the verdict should have been rendered in favor of Sergeant Schwarzl and that no two reasonable minds could disagree on this determination.

Burnett filed post-trial motions objecting to the grant of nonsuit in favor of the City and challenging the trial court's jury instructions on future loss of earning capacity and on pre-impact fright. Burnett's motions were denied by the trial court. Ross filed a post-trial motion based on the

trial court's refusal to submit the issue of contribution against the City to the jury; this motion was also denied. Burnett, Ross and Sergeant Schwarzl[5] filed timely appeals to this Court.

The central issue in this appeal is whether the trial court properly granted judgment *n.o.v.* in favor of Sergeant Schwarzl. Burnett asserts that Sergeant Schwarzl exhibited an intent to harm Ross that resulted in Burnett's loss of life.[6] The trial court held to the contrary using the analysis developed by the United States Supreme Court in the leading case, *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), for determining when a police pursuit may give rise to civil rights liability. Burnett claims that the trial court did not properly apply the *Lewis* standard.

 The second major issue is whether the trial court properly granted the City's motion for non-suit on Burnett's civil rights claim.[7] The trial court determined that Burnett did not present evidence sufficient to prove that the City had a policy of deliberate indifference to her

* * *

**5.** Sergeant Schwarzl filed a timely cross-appeal on April 18, 2001 on the trial court's denial of qualified immunity, which was included in the summary judgment motions of Officer Bigle and Sergeant Schwarzl. The trial court denied Sergeant Schwarzl's motion to certify an interlocutory appeal based upon *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), which provides that an order denying qualified immunity is an appealable collateral order in federal court. Sergeant Schwarzl joins with the City in defending the order of the trial court on all other issues presented herein.

**6.** This Court's scope of review with respect to whether judgment n.o.v. is appropriate is plenary, as with any review of questions of law. *Phillips v. A–Best Products Co.*, 542 Pa. 124, 130, 665 A.2d 1167, 1170 (1995). The stan-

dards for reviewing a judgment n.o.v. are set forth in the text below.

**7.** Our scope of review in an appeal from a trial court's denial of a motion to remove a nonsuit and to grant a new trial is limited to determining whether the trial court abused its discretion or committed an error of law. *Robinson v. City of Philadelphia*, 149 Pa. Cmwlth. 163, 612 A.2d 630 (1992) (citing *Henry v. McCrudden*, 133 Pa.Cmwlth. 231, 575 A.2d 666 (1990), *appeal denied*, 526 Pa. 651, 585 A.2d 470 (1990)). The standard for reviewing a decision to grant a nonsuit is well established. A nonsuit may not be granted unless, viewing all the evidence and all reasonable inferences arising from it in the light most favorable to the plaintiff, the jury could not reasonably conclude that the elements of the cause of action have been established. *Orner v. Mallick*, 432 Pa.Super. 580, 639 A.2d 491 (1994).

civil rights; Burnett's theory was that the City failed to enforce Directive 45, which, *inter alia*, provides guidelines for conducting a pursuit by police vehicle. Burnett argues that the trial court abused its discretion in this determination.

The final issue on appeal deals with Ross's claim for contribution. Ross argues that the trial court erred and abused its discretion in failing to submit the issue of contribution by the City to the jury and in denying Ross's post trial motion for contribution from the City.[8]

## JUDGMENT *NON OBSTANTE VEREDICTO*

■ The court may enter judgment n.o.v. only in a clear case where, after reviewing the evidence most favorably to the plaintiff, no two reasonable minds could fail to agree that the verdict was improper and should have been rendered in favor of the movant. *Moure v. Raeuchle,* 529 Pa. 394, 402, 604 A.2d 1003, 1007 (1992); *Solomon v. Baum,* 126 Pa. Cmwlth. 646, 560 A.2d 878, 880 (1989). It can be entered where appropriate as a matter of law or where the evidence requires it. *Id.* The court must consider only the evidence that supports the verdict and must afford the non-moving party the benefit of every fact and inference to be drawn from those facts. *Broxie v. Household Finance Co.,* 472 Pa. 373, 380, 372 A.2d 741, 745 (1977). To consider whether the police pursuit of Ross violated the civil rights of Burnett, the trial court applied the *Lewis* standard of culpability, which requires proof of an intent to harm that is unrelated to the legitimate purpose of arrest. Applying this standard and giving Burnett every favorable inference from the facts, the trial court held that Burnett did

not prove that Sergeant Schwarzl had an intent to hurt Ross beyond the intention to apprehend him. We agree.

Section 1983 of the Civil Rights Act protects citizens against deprivation of rights, privileges and immunities secured by the United States Constitution or act of Congress. Burnett relies on the substantive component of the due process clause of the Fourteenth Amendment that protects individual liberty interests against "certain government actions regardless of the fairness of the procedures used to implement them." *Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). The United States Supreme Court has been reluctant to expand the concept of substantive due process "because guideposts for reasonable decision-making in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights, Texas,* 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). In *Collins,* the Supreme Court recited the history of the due process clause of the Fourteenth Amendment, which was adopted, the Court said, to prevent government from abusing its power or using it as an instrument of oppression. It is not " 'a guarantee against incorrect or ill-advised personnel decisions.' " *Id.* at 129, 112 S.Ct. 1061 (quoting *Bishop v. Wood,* 426 U.S. 341, 350, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976)). Rather, it protects citizens from the arbitrary exercise of the powers of government. Stated otherwise, a plaintiff must show intent; a government's lack of due care does not implicate the Constitution.

In *Lewis,* 523 U.S. at 833, 118 S.Ct. 1708, the Supreme Court considered whether a police officer's high-speed pur-

---

**8.** The subsidiary issues of the court's failure to charge the jury on future loss of earning capacity and pre-impact fright need not be addressed because we hold that the judgment n.o.v. and the nonsuit were properly granted by the trial court.

suit of a motorcyclist that resulted in the death of the motorcycle passenger violated the substantive due process rights of the decedent. The Ninth Circuit held that the pursuit was undertaken with deliberate indifference to or reckless disregard for the passenger on the motorcycle, and, thus, it found liability under Section 1983. The Supreme Court granted *certiorari* to resolve a conflict among the circuits over the standard of culpability to be applied where it is alleged that a law enforcement officer in a pursuit has violated the substantive due process rights of a citizen. The different standards included "gross negligence," "reckless disregard," "deliberate indifference" and "shocks the conscience." Of these, the Court chose the most demanding standard of "shocks the conscience" [9] and held that it was not met in the *Lewis* case.

The Court explained that what may be a denial of fundamental fairness, shocking to the universal sense of fairness, in one set of circumstances, may fall short in another. *Betts v. Brady,* 316 U.S. 455, 462, 62 S.Ct. 1252, 86 L.Ed. 1595 (1942). Liability for negligently inflicted harm, the customary tort standard, is categorically beneath the threshold of constitutional due process. *Daniels,* 474 U.S. at 333, 106 S.Ct. 662. Conduct by state officials deliberately intending to injure, unjustifiable by any government interest, is the sort of official action most likely to rise to the conscience-shocking level.

■ The *Lewis* Court opined that "deliberate indifference" may be sufficient to shock the conscience in some circumstances but only when actual deliberation is practical. *Whitley v. Albers,* 475 U.S. 312, 320, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). For example, refusing medical treatment to someone jailed while awaiting trial may be such deliberately indifferent conduct that it will shock the conscience. *Lewis,* 523 U.S. at 850, 118 S.Ct. 1708. In a custodial situation, the government official has time to make "unhurried judgments" and the opportunity for repeated reflection.[10] *Id.* Where the police are faced with lawless behavior that requires an instinctive response, even unreasonable behavior by the police that would be actionable under standard tort law, does not shock the conscience. The Supreme Court in *Lewis* concluded:

> But when unforeseen circumstances demand an officer's instant judgment, *even precipitate recklessness fails to inch close enough to harmful purpose to spark the shock* that implicates "the large concerns of the governors and the governed." Just as a purpose to cause harm is needed for Eighth Amendment liability in a riot case, so it ought to be

---

**9.** In *Lewis,* the Supreme Court provided a précis of the "shocks the conscience" test in civil rights cases. The leading case is *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), wherein the police, without benefit of search warrant, entered Rochin's home and bedroom in time to watch him swallow two capsules. They took him to the hospital where he was forced to have his stomach pumped in spite of his protests. This was found to "shock the conscience" and to violate "decencies of civilized conduct." "Brutal," "offensive" and "violating a traditional sense of fair play" are other ways to describe "shocks the conscience." The Court

acknowledged that "what is conscience shocking is no calibrated yardstick, [but] it does, as Judge Friendly put it, 'point the way.'..." *Lewis,* 523 U.S. at 846–847, 118 S.Ct. 1708. A strong dissent argued that "shocks the conscience" is too subjective a standard to point at all.

**10.** However, the deliberate indifference standard is not applicable in all prison cases. It will not apply in the case where prison officials face a riot calling for fast action. *Lewis,* 523 U.S. at 852, 118 S.Ct. 1708, citing *Whitley,* 475 U.S. at 320, 106 S.Ct. 1078.

needed for due process liability in a pursuit case.

*Accordingly, we hold that high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability* under the Fourteenth Amendment redressable by an action under § 1983.

*Lewis,* 523 U.S. at 853–854, 118 S.Ct. 1708 (emphasis added).

Notwithstanding the Supreme Court's holding and analysis in *Lewis,* Burnett claims that the appropriate standard to apply here is deliberate indifference. She does so on the argument that the relevant time period for doing the constitutional analysis falls between 4:45 p.m. and 9:32 p.m., *i.e.,* from the moment of theft to the moment of the accident. This five hour period allowed for deliberation, and Burnett asserts that the police did so in a manner indifferent to her life. The trial court, however, based its analysis on the six-minute period between initiation of the pursuit and the accident, a period too short in duration to allow for deliberation.[11] Burnett also maintains that the police were improperly motivated by a personal sense of outrage at a *theft from a police vehicle* and, therefore, they initiated a pursuit of Ross without any legitimate law enforcement objective. Thus, she argues that the deliberate indifference of the police shocks the conscience and shows that the police intended to harm Ross. We reject this line of reasoning.

■ The decision of the police to pursue Ross would have been the same had the police witnessed the theft instead of determining that Ross was a suspect from their investigation of the crime just prior to initiating pursuit. The police had a duty to investigate the crime, and they had the right to try to apprehend a suspect. Further, the lawful investigation that preceded the pursuit does not change the central and controlling point that this is a police pursuit case. Burnett would have us ignore that central fact and consider, instead, all of the government action undertaken by the police in the resolution of the theft.[12] By merging the investigation phase with the apprehension phase of a criminal case that ended in a police pursuit, any such police pursuit could be measured against the standard of deliberate indifference. This approach is directly at odds with the holding in *Lewis.*

Burnett also argues that because the police were advised during the investigation that Ross might attempt to elude arrest, the police were absolutely precluded from pursuing him in an attempt to apprehend him and recover the stolen property. She argues from several false premises: that the police should have assumed that Ross would, in fact, attempt to elude the police; that the police should have given paramount significance to one comment, out of many heard in the course of the investigation; and that the police should have decided on some other means to apprehend their suspect. The irrational decision of Ross to drive approximately three miles on the interstate highway against the flow of traffic was a completely unpredictable action, and it is the action that caused the tragic deaths on the highway.

---

11. This finding of the trial court is consistent with the Supreme Court's holding in *Whitley.*

12. Burnett further maintains that the Directive 45 allowed the individual officers no discretion in initiating the pursuit of suspects. The language of Directive 45 does not support this position. Directive 45 gives direction on the operation of police vehicles and the considerations before initiating a pursuit, but it specifically commits the decision to initiate a pursuit to the individual officer. *See, infra* note 23.

Although the trial court limited its analysis to the actual time frame of the chase, it did consider the antecedent investigation. The trial court noted that although the energy expended by the officers in solving this petty theft may have been more zealous than it would have been for a similar theft of a private citizen's property,[13] none of the facts of the investigation are sufficient to prove that the police intended to harm Ross when the decision was made to pursue him. It is the motivation for that decision, alone, under the circumstances of the suspect's lawless behavior in eluding the police, which must be scrutinized. The pursuit was short in duration; the pursuit was conducted at low speed; the pursuit was called off; and the police cruisers were not permitted to enter the interstate highway.[14] Ross's refusal to stop his vehicle in response to the police lights and sirens was lawlessness to which the police reacted, without any time to deliberate. There is no evidence that the pursuit of Ross was motivated by an intent to induce lawlessness, or to terrorize, cause harm, or kill the suspect; as in *Lewis*, the police acted instinctively to apprehend a suspected criminal offender, a legitimate governmental interest.

The trial court considered all the evidence in the record supporting the verdict, but that evidence was legally insufficient to allow reasonable minds to agree that it supported a verdict against Sergeant Schwarzl. In reaching this conclusion, the trial court correctly applied the "shocks the conscience" standard, rather than the deliberate indifference standard, to hold that Sergeant Schwarzl did not intend to harm Ross when she ordered his pursuit and, thus, could not be called to answer for her conduct under Section 1983.

## NON–SUIT AGAINST THE CITY OF PHILADELPHIA

Burnett maintains that the City failed to enforce Directive 45 over a five-year period, and this demonstrates deliberate indifference to public safety in violation of Burnett's substantive due process rights. By Directive 45, entitled "Safe Operation of Police Vehicles," the police department established criteria to be considered by the police in initiating and continuing vehicle pursuits of suspects. Burnett proffered statistical data[15] and the testimony of an expert in support of her claim of deliberate indifference. The trial court agreed that the standard of deliber-

---

**13.** Whether the people of Philadelphia would have been better served that day by an investigation of a more serious crime by a more hardened criminal is not an appropriate inquiry for the courts. Prosecutorial discretion includes choosing which crimes to investigate and how much effort to expend. Such discretion is beyond judicial review. *Commonwealth v. Malloy*, 304 Pa.Super. 297, 450 A.2d 689 (1982). "Motivation" in a civil rights case refers to the intention to abuse power for the purpose of depriving a citizen of constitutionally-protected rights.

**14.** By contrast, the pursuit in *Lewis* reached speeds of over 100 m.p.h. in a residential neighborhood, and *it was not called off*. As observed by the Court, "Willard's [the motorcyclist] outrageous behavior was practically instantaneous, and so was Smith's instant response. While prudence would have repressed the reaction, the officer's instinct was to do his job as a law enforcement officer, not to induce Willard's lawlessness, or to terrorize, cause harm or kill." *Lewis*, 523 U.S at 855, 118 S.Ct. 1708.

**15.** The documentation was compiled and prepared by the Philadelphia Police Department and was entered into the record by the trial judge. Exhibit C is a report of the Police Accident Reduction Unit; Exhibit D is a Management Review Bureau Police Vehicle Accident Reduction Study; Exhibit E is a Safety Study prepared for the Risk Management Division of the City of Philadelphia's Finance Department.

ate indifference was the appropriate one to apply when considering municipal liability, but it found the evidence in question was too vague to have any probative value and refused to admit it. A trial court enjoys broad discretion to make evidentiary rulings, and absent abuse of discretion such decisions will not be set aside on appeal. *Henery v. Shadle*, 443 Pa.Super. 331, 661 A.2d 439 (1995), *alloc. denied*, 542 Pa. 670, 668 A.2d 1133 (1995). A judgment of nonsuit [16] can be entered only in clear cases, and a plaintiff must be given the benefit of all evidence favorable to him, together with all reasonable inferences of fact arising therefrom, and any conflict in the evidence must be resolved in his favor. Pa. R.C.P. No. 230.1; *Flagiello v. Crilly*, 409 Pa. 389, 390–391, 187 A.2d 289, 290 (1963).

In her appeal, Burnett asserts that the trial court abused its discretion when it refused to admit Burnett's statistical case, leaving virtually no evidence to support her Section 1983 claim against the City. She also claims that she may pursue the City separately under Section 1983 even if we uphold the trial court's grant of judgment n.o.v. in favor of Sergeant Schwarzl.

We disagree that she may proceed against the City where its employees have been found blameless of constitutional misconduct.

■ Municipal liability under Section 1983 of the Civil Rights Act was first allowed in *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978),[17] in which the Supreme Court overruled prior case law to hold that a municipality is a "person" within the meaning of Section 1983. Under *Monell*, it was also established that the city's policy must be the "moving force [behind] the constitutional violation;" *respondeat superior* cannot serve as the basis for municipal liability under Section 1983.

In *City of Canton, Ohio v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), the Supreme Court extended Section 1983 municipal liability to inadequate training of a city's employees. In *Canton*, Mrs. Harris was arrested and brought to the police station. While there, she spoke incoherently and slumped to the floor on two occasions; the police left her on the

---

16. An order granting a nonsuit is proper only if the jury could not reasonably conclude that the elements of the cause of action have been established. *Ford v. Jeffries*, 474 Pa. 588, 591–592, 379 A.2d 111, 112 (1977). It is the duty of the trial judge to determine, prior to sending the case to the jury, whether or not the plaintiff has met this burden. *Morena v. South Hills Health System*, 501 Pa. 634, 462 A.2d 680 (1983).

17. In *Monell*, the Supreme Court overruled its prior determination in *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), that municipalities are not "persons" to whom Section 1983 applies. Under *Monell*, local government bodies can be sued directly under Section 1983 for monetary, declaratory, or injunctive relief where the action complained of executes a policy statement, ordinance, regulation, or decision officially adopted by that body's officers. The local governmental unit may also be directly sued for constitutional deprivations pursuant to governmental "custom" even though such a custom has not received formal approval through the official decision making channels. *Monell*, 436 U.S. at 690, 98 S.Ct. 2018. The Court held, however, "(T)he language of Section 1983 ... compels the conclusion that Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort. In particular, we conclude that a municipality cannot be held liable *solely* because it employs a tortfeasor or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* It is when execution "fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694, 98 S.Ct. 2018.

floor to prevent more falls. After one hour she was released, and her family took her to the hospital by ambulance. She was diagnosed as having severe emotional problems, hospitalized and received outpatient treatment for one year. The question was whether the city could be held liable under Section 1983 for failing to provide her medical treatment while in its custody. Ultimately, the case was remanded [18] to the District Court for more fact-finding; the case, however, served as the platform for the Supreme Court's enunciation of the principles by which to judge whether a municipality can be held liable for failing to train its police officers.

In *Canton*, the city's express policy required that a jailer attend to the medical needs of those detained; the policy was valid. The Supreme Court rejected the city's argument that only policies unconstitutional on their face should give rise to Section 1983 liability, as was the case in *Monell*.[19] Instead, it held that where the police are not trained adequately on the valid policy and the "constitutional wrong has been caused by that failure to train," liability will attach. *Canton*, 489 U.S. at 387, 109 S.Ct. 1197. The issue, then, is whether a city's failure to train can justifiably be considered a "city policy." Because this failure to train results from "unhurried judgment," the standard of culpability is deliberate indifference to the constitutional rights of its inhabitants.[20] *Id.* at 392, 109 S.Ct. 1197.

Where the municipal policy on its face is not unconstitutional, but rather, plaintiff asserts there is a policy of failing to train, the evidentiary burden is a high one. It is necessary for the plaintiff to show a causal connection between the "policy" and the constitutional deprivation, and the policy must be the "moving force" behind the injury.[21] The adequacy of the program, not the shortcomings of a particular officer, is the focus of the inquiry. It will not suffice that a sound program is occasionally negligently administered or that a particular officer needed more training. As the Court noted in *Canton*, "And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the basis for making the city liable." *Id.* at 391, 109 S.Ct. 1197.

Because the policy must be the focus in a municipal liability case, a single incident of unconstitutional activity is not sufficient to impose liability. Unless proof of the single incident includes proof that it was directly caused by an unconstitutional activity, one incident is not sufficient to impose liability.[22] The Supreme Court

---

18. Justice O'Connor dissented to the remand. She agreed with the principles announced in *Canton;* however, she believed the record was fully developed on the issue of Canton's liability and that it did not support such a finding. It is one thing to train police to recognize life-threatening episodes, quite another to train them in the intricacies of mental health.

19. In *Monell*, the policy in question required pregnant city employees to go on leave before it was medically necessary.

20. In *Canton*, the court quoted from *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), where it held:

[M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by city policymakers. . . .
*Canton*, 489 U.S. at 389, 109 S.Ct. 1197.

21. This was announced in *Monell; see also Board of the County Commissioners v. Brown,* 520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).

22. *City of Oklahoma v. Tuttle,* 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (wherein the Court held that the evidentiary burden of plaintiff in a Section 1983 case cannot be satisfied by inference from a single

cautioned that it did not intend to "engage the federal courts in an endless exercise of second-guessing municipal-training programs. This is an exercise we believe the federal courts are ill-suited to undertake as well as one that would implicate serious questions of federalism." *Canton*, 489 U.S. at 392, 109 S.Ct. 1197.

■■■ Against those principles, we test Burnett's claim against the City on Directive 45.[23] Burnett does not challenge the validity of the policy expressed in Directive 45; indeed, its goal of safety is unassailable. However, she claims that, as in *Canton*, Directive 45 was unconstitutionally applied. Specifically, she asserts that the City failed to train, supervise and discipline its police officers for violations of Directive 45. This "policy" was deliberately indifferent to the safety of the public and caused the constitutional harm to Burnett. Evidence to support this claim, however, was found to be entirely lacking by the trial court.

Burnett's proffered evidence [24] consisted of statistics on the number of accidents and the number of pursuits that occurred in Philadelphia from 1993 through 1997. Over this period the data showed: that accidents occurred involving City vehicles; that some of the accidents occurred during or as a result of police pursuits; that some of the pursuits were in violation of the recommendations of Directive 45; and that approximately 10% of the accidents resulted in formal discipline of the officers involved.

The data are absent of any detail, such as the cause of the accidents or of the injuries. Directive 45 requires police to use seat belts, and this "violation" of policy could be the basis of injury. The data had no detail on police pursuits, the circumstances that initiated them, how they were conducted and other facts that would make the raw data meaningful. This additional information was available to Burnett's experts who declined to review it. Further, Burnett's experts did not attempt to design their own study using methodology that could be tested at trial. Notwithstanding these problems with the data, Burnett's expert, Dr. Territo, drew the sweeping conclusion in his report [25] that

incident of excessive use of force by a police officer).

23. Directive 45, entitled "Safe Operation of Police Vehicles," is a twelve-page document with appendices, that states a policy of "preventing accidents, injuries and property damage during routine and emergency operation." S.R. 65a. It addresses the topic of routine vehicle operation as well as emergency vehicle operation, pursuits, operating a vehicle in reverse, motorcycles, parking and traffic. The section on pursuits is the longest. It outlines the duties of an initiating officer, those of Police Radio and the monitoring supervisor in a pursuit, and it provides instruction on when a pursuit is appropriate, such as when a vehicle has been stolen or is being operated in a manner that creates a danger to others. It states that

an officer may attempt, through proper emergency driving technique or other sound police procedures, to accurately

identify, and when possible, apprehend a violator for ANY offense.
S.R. 95a.

24. The record contains a colloquy on the admissibility of the statistics and the testimony of Burnett's expert and the ruling by the trial judge to exclude the evidence. R.R. 904a—946a. The expert was permitted to testify on other matters.

25. Dr. Territo concluded in his report, *inter alia*, that: (8) The Philadelphia Police Department did not have appropriate policies adequately enforced to deal with the problem of police pursuits; and (9) if appropriate police procedure had been followed, the accident involving innocent civilians would not have occurred. R.R. 935a. The data, however, was not sufficient to bear out the claim of "innocent civilian" injury. The trial court determined that these conclusions could not be based upon the statistics presented because

the City had failed to adopt an appropriate enforcement policy and that had Directive 45 been enforced, accidents would not have occurred.

▮ A trial court's decision not to admit evidence is reviewed only for abuse of discretion. As stated by our Supreme Court,

> Once the trial judge determines the evidence is relevant, the further task of the judge is to balance the probative value of evidence against any prejudicial effect of that evidence. Since such a balancing is a particular specialty of the trial judge, rulings upon admissibility are committed to the sound discretion of the trial court, and those rulings will not be overturned in the absence of an abuse of discretion.

*Henery v. Shadle*, 661 A.2d at 444. The trial court did not abuse its discretion in not admitting the evidence proffered by Burnett. The data, such as they were, failed to make a causal connection between the alleged lack of enforcement and police car accidents, let alone pursuits that violated substantive due process rights. Moreover, they did not show that the City was the "moving force" in Burnett's deprivation of constitutional rights. Lastly, the inferences of the expert were not credible. As observed by the trial court, a 10% discipline rate says nothing; it may represent a high, not a low, rate of enforcement.[26]

There is another, even more basic problem with Burnett's case against the City: the police involved in the Ross pursuit were found *not* to have violated her substantive due process rights. In *Canton,*

the Supreme Court cautioned that a plaintiff may not infer a failure to train from a single unconstitutional action; here Burnett tries to make this inference without even a *single* unconstitutional action by the City's employees.

A municipality cannot be held liable for the actions of its employees, such as the use of excessive force, if its employees did not commit a constitutional violation. To do so would turn the doctrine of *respondeat superior* on its head. Burnett was required to prove an underlying constitutional violation by City employees before she could seek to hold the City also liable for its own unconstitutional conduct. Since there was no underlying constitutional violation by Officer Bigle or Sergeant Schwarzl, the nonsuit was proper on purely legal grounds.

To be sure, Burnett directs our attention to authority for a contrary view. In *Fagan v. City of Vineland,* 22 F.3d 1283 (3d Cir.1994) the Third Circuit Court of Appeals held:

> We hold that in a substantive due process case arising out of a police pursuit, an underlying constitutional tort can still exist even if no individual police officer violated the Constitution.... The City is liable under section 1983 if its policymakers, acting with deliberate indifference, implemented a policy of inadequate training and thereby caused the officers to conduct the pursuit in an unsafe manner and deprive the plaintiffs of life or liberty.

*Id.* at 1292. The Court explained that even though a police officer's conduct does

---

the statistics were too vague to define what type of accidents occurred, what elements came into play to cause the accidents, and whether the statistics were actually alarming in their proportions to the activities of the Philadelphia police force.

**26.** As noted by the City, the discipline data record only shows formal actions and not lesser discipline actions, such as reprimands. So the data do not tell the entire enforcement story.

not meet the "shocks the conscience" standard, this does not absolve the municipality. If it can be shown that the plaintiff suffered a deprivation of life or liberty because the officer was following a city policy, then the city can be liable under Section 1983. The Court reasoned that "[t]he pursuing police officer is merely the causal conduit for the constitutional violation committed by the city." *Id.*

At best, *Fagan* provides a thin reed of support. It has not stood the test of time even in the Third Circuit. As noted by a subsequent panel, in commenting on *Fagan,*

It appears that, by focusing almost exclusively on the "deliberate indifference" prong of the *Collins* test, the panel opinion did not apply the first prong—establishing an underlying constitutional violation.

*Mark v. Borough of Hatboro,* 51 F.3d 1137 (3d Cir.1995). Because plaintiff could not show that his constitutional rights were violated by a Borough of Hatboro police officer, he could not proceed against the borough under a failure to train theory. See also, *Leddy v. Township of Lower Merion,* 114 F.Supp.2d 372, 376 (E.D.Pa. 2000), which notes the "split" in the Third Circuit on the issue of municipal liability where there is no underlying constitutional violation.

The response of other circuits to *Fagan* has been even less sanguine. In *Trigalet v. City of Tulsa, Oklahoma,* 239 F.3d at 1150 (10th Cir.2001), the Tenth Circuit Court of Appeals refused to allow a case against the City of Tulsa for a Section 1983 violation in the absence of unconstitutional behavior by city employees. It turned first to the U.S. Supreme Court holding in *City of Los Angeles v. Heller,* wherein it was said:

If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point.

475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) (emphasis the Court's).[27] Next, *Trigalet* listed decisions from First, Fourth, Sixth, Seventh, Eighth, Ninth and Eleventh Circuits, all holding that the threshold issue in a municipal liability case is "whether the action causing the harm (police pursuit resulting in death of innocent bystander) states a constitutional violation at all." *Trigalet,* 239 F.3d at 1155. The Tenth Circuit identified *Fagan* as the single contrary decision but concluded that in light of *Hatboro,* the viability of *Fagan* even in the Third Circuit is doubtful.[28]

*Fagan* is instructive but not binding on this Court,[29] and its instruction is less than

---

**27.** *Fagan* tried to distinguish *Heller* on the grounds that it was a Fourth Amendment case, as opposed to a Fourteenth Amendment case.

**28.** *Trigalet* also lists all decisions criticizing and expressly rejecting *Fagan.*

**29.** In *A.L. Lockhart v. Fretwell,* 506 U.S. 364, 376, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993), the concurring opinion noted:

The Supremacy Clause demands that state law yield to federal law, but neither federal supremacy nor any other principle of federal law requires that a state court's interpre-

tation of federal law give way to a (lower) federal court's interpretation. In our federal system, a state trial court's interpretation of federal law is no less authoritative than that of the federal court of appeals in whose circuit the trial court is located.

This principle was underscored in our Supreme Court's decision in *Commonwealth v. Cross,* 555 Pa. 603, 726 A.2d 333 (1999). Cross argued that the Pennsylvania Supreme Court had been "reversed" by a Third Circuit opinion. Our Supreme Court set Mr. Cross straight: only the U.S. Supreme Court can reverse the Pennsylvania Supreme Court.

persuasive for the reasons set forth above. *Heller* bars Burnett from pursuing the City under Section 1983. We hold, therefore, that in the absence of an underlying unconstitutional action by employees of the City against Burnett, we will not consider the question of whether the City failed to train those employees on Directive 45; it is "quite beside the point."

The trial court's entry of a compulsory nonsuit was proper. Burnett tragically lost her life, but this cannot be tied to an unconstitutional action of the police. Thus, she cannot proceed against the City under Section 1983. The trial court did not abuse its discretion in excluding the evidence she proffered. In the absence of a legal foundation or any evidence, no holding but a nonsuit is conceivable.

## ROSS CLAIM FOR CONTRIBUTION

Ross cites as error the trial court's refusal to instruct the jury on the joint tortfeasor status of the City, and filed post trial motions seeking contribution from the City in negligence. The trial court denied these post trial motions, which Ross has appealed to this Court.

█ The record does not contain a direct negligence claim asserted by Ross against the City. By way of pleading new matter in its answer to the complaint, Ross sought to establish that the City was "liable over" to the Estate of Ross on the cause of action asserted by Burnett. The trial court correctly precluded Ross from asserting a claim for contribution by the City to the jury because no such right exists. The City is immune from a direct suit in negligence under the holding in *Lindstrom v. City of Corry*, 563 Pa. 579, 763 A.2d 394 (2000). Ross did not file a

direct negligence action and, therefore, has no right to share in the negligence settlement tendered by the City to the plaintiffs.

█ Ross asserts a right to contribution from the City as a joint tortfeasor, but cites no authority that would compel contribution under the facts of this case. The City has tendered the statutory maximum, and that amount exceeds the amount tendered by Ross's insurance carrier on behalf of his insolvent estate. Ross is also precluded from contribution under the holding of this Court in *Kriner v. Barbour*, 145 Pa.Cmwlth. 64, 602 A.2d 450 (1992), *alloc. denied*, 531 Pa. 656, 613 A.2d 561 (1992). The trial court's ruling on the issue of contribution by the City in the negligence action was a reasonable exercise of discretion.

## CONCLUSION

We hold that the judgment n.o.v. in favor of Sergeant Schwarzl was proper; the judgment of non-suit in favor of the City was proper; and the denial of Ross's claim for contribution from the City was proper.

Accordingly, we affirm the trial court's Order.

### *ORDER*

AND NOW, this 28th day of June, 2002, the order of the Court of Common Pleas for the County of Philadelphia, dated April 4, 2001, in the above-captioned claims is hereby affirmed.

---

State supreme courts have concurrent jurisdiction with lower federal courts over federal constitutional questions and may formulate their own interpretation of Supreme Court precedent, which may be in opposition to that of the lower federal courts.